UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                    :

UNITED STATES OF AMERICA

                    :

       - v. -                       :        SEALED SUPERSEDING
                                      INDICTMENT

ALEXEY KOMOV,

                    :        S2 21 Cr. 676 (LAK)

           Defendant.

                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COUNT ONE
### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury charges:

### The Defendant and Other Relevant Persons

1.    ALEXEY KOMOV, the defendant, is a Russian national. At all times relevant to this Indictment, KOMOV worked for the benefit of Konstantin Malofeyev, or entities controlled by Malofeyev, and otherwise provided services to, and for the benefit of, Malofeyev.

2.    Konstantin Malofeyev ("Malofeyev") is a Russian national who was at all relevant times the owner and managing partner of Marshall Capital Partners, which was a Russian equity investment group. On or about December 19, 2014, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Malofeyev as a Specially Designated National ("SDN"). In so designating Malofeyev, OFAC explained that Malofeyev was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for, or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine

and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic.

3.      John Hanick, a/k/a "Jack Hanick" ("Hanick"), is a United States citizen. From in or around 1996 through in or around 2011, Hanick worked as a producer for a United States cable television network located in New York, New York.  From at least in or about 2013 through at least in or about 2020, Hanick, including for a period of time, as an employee of Malofeyev, or companies owned and controlled by Malofeyev, provided funds, goods, and services to and for the benefit of Malofeyev and companies owned and controlled by Malofeyev, and received funds, goods, and services from Malofeyev.

## The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

4.      The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

5.      In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in,

2

actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

6.      The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and it was most recently continued on March 1, 2023.

7.      On multiple occasions, the President has expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

8.      The Ukraine-Related Executive Orders authorize the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorize the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States

3

Government.

9.      To implement the Ukraine-Related Executive Orders, OFAC issued certain regulations, referred to as the Ukraine-Related Sanctions Regulations.  These regulations incorporate by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201.  The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests in property are therefore blocked, are published in the Federal Register and incorporated into the SDNs and Blocked Persons List (the "SDN List"), which is published on OFAC's website.  *See* 31 C.F.R. § 589.201. n.1.

10.     Under the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406.  Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

11.     On or about December 19, 2014, OFAC designated Malofeyev as an SDN pursuant to Executive Order 13660.

### The Sanctions Violations

12.     From at least in or about 2013 through at least in or about 2020, ALEXEY KOMOV, the defendant, assisted Malofeyev and Hanick in a scheme for Hanick to provide funds, goods, and services to and for the benefit of Malofeyev and companies owned and controlled by Malofeyev, and for Hanick to receive funds, goods, and services from Malofeyev.  In particular, as described further below, Hanick worked for Malofeyev on a project to start a Russian television

network (the "Russian TV Network") and was generally responsible for the technical and operational aspects of the Russian TV Network. Hanick also worked for Malofeyev on projects to establish and run a Greek television network, and to attempt to acquire a Bulgarian television network, among other things. As KOMOV well knew, Hanick was paid for his work for Malofeyev, and his compensation was overseen by Malofeyev. Through KOMOV's assistance, Malofeyev continued to receive funds, goods, and services from Hanick, and to provide funds, goods, and services to Hanick, after being designated as an SDN in December 2014 and in violation of Executive Order 13660 and the Ukraine-Related Sanctions Regulations, until at least in or about 2020.

13.     As part of the scheme to employ Hanick in violation of Executive Order 13660 and the Ukraine-Related Sanctions Regulations, ALEXEY KOMOV, the defendant, and Malofeyev used Hanick's assistance to transfer, and to attempt to transfer, interests in property in the United States owned by Malofeyev to a Greek associate of Malofeyev (the "Greek Business Partner"), in violation of Executive Order 13660 and the Ukraine-Related Sanctions Regulations.

KOMOV Recruits Hanick to be Employed by Malofeyev and Work on the Russian TV Network

14.     At all times relevant to this Indictment, Malofeyev was and had been the Chairman of the Board of Directors of a corporate group, which had a public website listing the "Russian TV Network" as one of its projects. The Russian TV Network also had its own website, which, as of the date of this Indictment, lists Malofeyev as the Founder of the Russian TV Network.

15.     Beginning in at least 2012, ALEXEY KOMOV, the defendant, began corresponding with Hanick regarding the plan to employ Hanick to work for Malofeyev on the Russian TV Network. As part of KOMOV's recruitment of Hanick, KOMOV travelled to Manhattan and met with Hanick on at least two occasions, and subsequently introduced Hanick to

Malofeyev in Russia.

16.    On or about April 27, 2013, Hanick sent Malofeyev, copying ALEXEY KOMOV, the defendant, an email in which Hanick, addressing Malofeyev, stated that he, *i.e.* Hanick, "came to Russia to work for you."

17.    In or about July 2013, Hanick moved to Russia. Prior to moving there, Malofeyev and Hanick negotiated the terms of Hanick's employment, including the salary Hanick would receive, the payment for his housing in Moscow, and his Russian work visa. On or about April 22, 2013, Hanick sent Malofeyev an e-mail requesting confirmation of "your payment of $5000/month" toward Hanick's housing stipend, setting forth certain deductions to be taken from Hanick's "first month pay of $20,000," among other terms, and asking whether Hanick and "Alexey", *i.e.*, ALEXEY KOMOV, the defendant, could collectively use a particular free office space. Hanick forwarded this e-mail to KOMOV on or about the same day. In or about May 2013, Malofeyev sent an email to Hanick in which Malofeyev confirmed their agreement on Hanick's salary, a $5,000 monthly housing stipend, and health insurance, so that Malofeyev's attorney could prepare Hanick's "work contract for my [Hanick's] visa." An attorney at Malofeyev's investment company, Marshall Capital Partners, subsequently emailed Hanick a draft employment contract between a separate Russian entity and Hanick, that reflected the terms that Malofeyev had agreed to with Hanick.

18.    On or about December 19, 2014, OFAC designated Malofeyev as an SDN. Nonetheless, Malofeyev continued to employ Hanick on the Russian TV Network and Hanick continued to report directly to Malofeyev. In or about January 2015, Hanick sent Malofeyev a draft of a "[Russian TV Network] Board News Policy." Hanick wrote that the policy was meant "to implement your vision and to provide you with information for you to make decisions . . . You

are the founder and chief architect of the project. We, as board members have the responsibility to direct the staff to implement your instructions." Later in or about January 2015, Hanick sent an email to Malofeyev regarding the "Funding of [the Russian TV Network]," in which Hanick noted that "there is 0 money on our account" and "You said when we had a problem to contact you directly."

19.     Notwithstanding OFAC's designation of Malofeyev as an SDN, ALEXEY KOMOV, the defendant, worked with Hanick to launch the Russian TV Network. On or about January 10, 2015, Hanick e-mailed KOMOV, "I hope to start new this year and get [the Russian TV Network] right and on the air with your help." In or about March 2015, KOMOV wrote an e-mail to Malofeyev, Hanick, and another Russian TV Network employee, referencing the group's prior discussion with Malofeyev earlier in the same day, and giving Hanick instructions for the creation of two types of programs and instructions on staff allocations. KOMOV further wrote, "Hopefully Konstantin will be providing general direction and guidance for both projects. Looking forward to our long-term co-operation on those exciting endeavors!"

20.     On or about March 30, 2015, ALEXEY KOMOV, the defendant, instructed Hanick to task two other employees "to s[t]art preparation work already now, and find relevant videos, quotes, maps, visuals, etc that would be needed to produce the first 8 minutes pilot according to the 1.5 pages text that I've sent to you." Hanick instructed the employees to "please start preparing the pilot" and scheduled a meeting with them and KOMOV.

21.     The Russian TV Network went on the air in Russia in or about April 2015. Prior to the launch, Hanick requested ALEXEY KOMOV, the defendant, to serve as a moderator for the first broadcast, writing "KM and I agree that we need you on this the first show on [the Russian TV Network]!!!" After KOMOV agreed to participate, Hanick wrote, "I am so happy that

you are on board. I could not do our first broadcast without you!"  Hanick was generally responsible for the technical and operational aspects of the Russian TV Network, pursuant to a plan developed with Malofeyev and with input from KOMOV.  For example, in or about July 2016, KOMOV wrote to Hanick, "We've discussed with Konstantin last week the concept of my new weekly TV programs (about education ) and he said to discuss it with you" and two other Russian TV Network employees.

22.     Malofeyev paid Hanick for his work for the Russian TV Network through two Russian entities.  From in or about 2013 through in or about February 2016, Malofeyev arranged to pay Hanick through a Russian entity ("Russian Entity-1"), that had been listed as Hanick's employer on the employment contract Malofeyev had negotiated with Hanick.  From in or about May 2016 through 2018, Malofeyev arranged to pay Hanick through another Russian entity ("Russian Entity-2"). Although these entities nominally employed and paid Hanick, Malofeyev directly oversaw and was responsible for Hanick's employment and the payment of Hanick's salary.  For instance, in or about May 2018, Hanick sent an email to Malofeyev, writing "At the end of May, I'll be finished with [Russian Entity-2]. This means that my visa to stay in Russia will end. We need help to stay. Can [Russian Entity-2] extended my employment without pay? My visa with them is through next April? Can you help? I'm sure the solution is simple." The salary payments Malofeyev made to Hanick were made to a Russian bank account in Hanick's name. However, Hanick returned some of these funds to the United States.  In or about March 2017, Hanick wired a portion of the payments he had received from Russian Entity-2 from his Russian bank account to a bank account he held at a bank located in New York, New York.

23.     At the same time that he employed Hanick on the Russian TV Network, Malofeyev also directed Hanick to work on at least two other projects.  The first was a project to

establish and run a Greek television network (the "Greek TV Network") as a joint venture between Malofeyev and the Greek Business Partner. Hanick primarily resided in Greece from in or about May 2015 through in or about February 2016 and reported to Malofeyev about this project. Second, beginning in or about January 2015, Malofeyev directed Hanick to assist in Malofeyev's efforts to acquire a Bulgarian television network (the "Bulgarian TV Network"). During his participation in both the Greek TV Network and the Bulgarian TV Network projects, Hanick continued to receive advice and guidance from ALEXEY KOMOV, the defendant, pertaining to Hanick's work for the Russian TV Network.

### KOMOV Assists Malofeyev and Hanick to Transfer Malofeyev's Interest in United States Property to the Greek Business Partner

24.    In or about March 2014, Malofeyev, represented by, among others ALEXEY KOMOV, the defendant, made an investment of approximately $10 million to purchase shares of stock in a Texas-based bank holding company (the "Texas Bank" and the "Texas Bank Investment").

25.    In or about January 2014, ALEXEY KOMOV, the defendant, e-mailed a Texas attorney ("Individual-1"), "I plan to come to the US with two of my close friends Konstantin Malofeev [sic]... and [another individual] on Feb 4-9, 2014... I'd like the three of us to meet with you to discuss our cooperation, and also joint investment projects (please propose attractive investment opportunities with reliable partners for $50-100 mln participation from our side)". On or about March 25, 2014, KOMOV wrote to Individual-1, "Konstantin has confirmed today that he goes ahead with the 10 mln investment in the bank project."

26.    Malofeyev purchased his shares in the Texas Bank through a shell company incorporated in the Seychelles (the "Shell Company"). At the time he made the investment, Malofeyev's representatives provided the placement agent for the Texas Bank Investment with

documentation showing that Malofeyev was the 100% ultimate beneficial owner of the Shell Company through various other corporate entities owned by Malofeyev. On or about March 31, 2014, the Texas Bank issued a certificate of shares listing the Shell Company as the owner of the shares.

27.     After OFAC designated Malofeyev as a SDN in December 2014, the Texas Bank filed a blocked asset report with OFAC (an obligatory report to OFAC filed by holders of property blocked by sanctions) regarding Malofeyev's beneficial ownership of the certificate of shares in the name of the Shell Company.

28.     In or about March 2015, Malofeyev began making plans to transfer beneficial ownership of the Shell Company to the Greek Business Partner, due to a request by the Greek Business Partner for capital to deal with a cash flow problem in the Greek Business Partner's business.

29.     On or about March 4, 2015, ALEXEY KOMOV, the defendant, wrote to Individual-1, "I need to discuss with you several things: previous investment in the bank project (we want to consider selling it)". On or about March 14, 2015, KOMOV wrote to Individual-1, "No plan to sell, but rather change the owner of the share, with the share remaining where it is. Just need to get the current info on the project." On or about March 17, 2015, KOMOV again e-mailed Individual-1 about the Texas Bank Interest, stating in part, "We want to keep it where it is now, only the owner from our side changes." Individual-1 forwarded the e-mail to a representative of the Texas Bank.

30.     In or about May 2015, an attorney employed by Malofeyev (the "Malofeyev Attorney") exchanged several emails with an attorney employed by the Greek Business Partner (the "Greek Business Partner Attorney"), regarding a plan to draft and sign a Sale and Purchase

10

Agreement to transfer ownership of the Shell Company from Malofeyev to the Greek Business Partner, which would have the effect of transferring ownership of the Texas Bank Investment, in violation of Executive Order 13660 and the Ukraine-Related Sanctions Regulations.

31.     Consistent with this effort, in or about May 2015, an associate of Malofeyev e-mailed Individual-1, copying ALEXEY KOMOV, the defendant, and requesting official documentation confirming the Shell Company's holding in the Texas Bank.

32.     On or about June 8, 2015, the Greek Business Partner sent an email to the Malofeyev Attorney, Hanick, and a Russian accountant employed by Malofeyev (the "Malofeyev Accountant"), in which the Greek Business Partner explained that he planned to use the Texas Bank Investment as "collateral . . . to obtain a bank guarantee covering the payments due." The next day, Hanick replied to the Greek Business Partner and the other recipients stating "I will wait in Moscow one more day for documents. I will return to Greece on Wednesday." The Greek Business Partner responded to Hanick instructing him to "be in touch with" the Malofeyev Attorney and the Greek Business Partner Attorney and "make sure all necessary documents will be handed over to you."

33.     On June 10, 2015, Hanick flew from Moscow to Athens. On June 15, 2015, the Greek Business Partner Attorney sent an email to the Malofeyev Attorney and the Malofeyev Accountant, confirming that the Greek Business Partner had received a "copy of the share certificate" in the Texas Bank, which Hanick had brought to the Greek Business Partner from Moscow.

34.     Consistent with the plan to change the owner of the Texas Bank interest put into motion by ALEXEY KOMOV, the defendant, on or about June 9, 2015, Malofeyev signed a Sale and Purchase Agreement purporting to transfer ownership of the Shell Company to the Greek

11

Business Partner in exchange for "USD 1.00 (One US dollar)." The Sale and Purchase Agreement was printed with a blank space for the date of the agreement, and a handwritten date was added that falsely backdated the agreement to July 2014, when, in truth and in fact, the agreement was made in or about June 2015. However, the registry of ownership of the Shell Company reflects that Malofeyev owned the Shell Company continuously from when it was created until June 2015, and ownership was not transferred prior to that time.

35.    On or about July 8, 2015, a representative of the Texas Bank sent an email to the Malofeyev Attorney stating that the Texas Bank Investment "constitutes 'blocked property'" because Malofeyev had been listed as a SDN, and that "as a result of this designation, Mr. Malofeev's [sic] property, and interests in property, within the United States must be frozen, and U.S. persons are generally prohibited from conducting any transactions with Mr. Malofeev." On or about July 10, 2015, the Malofeyev Attorney responded, asserting falsely that: "As far as I know, the ownership over [the Shell Company] was transferred by Mr. Malofeev to a third party (a new ultimate beneficial owner) at the beginning of July 2014, i.e. before the SDN designation." In truth, as Malofeyev and the Malofeyev Attorney well knew, the transfer of the Shell Company was executed in June 2015, at approximately the same time as Hanick physically delivered a copy of the Texas Bank certificate of shares to the Greek Business Partner and after the designation of Malofeyev as an SDN.

## Statutory Allegations

36.    From at least in or about December 2014, up to and including at least in or about 2020, in the Southern District of New York and elsewhere, ALEXEY KOMOV, the defendant, with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate the IEEPA, in violation of 50 U.S.C.

§ 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

37.     It was a part and an object of the conspiracy that ALEXEY KOMOV, the defendant, and others known and unknown, would and did willfully and knowingly violate the IEEPA, and the regulations promulgated thereunder, to wit, ALEXEY KOMOV, the defendant, and his co-conspirators willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of Konstantin Malofeyev, whom OFAC had listed as a Specially Designated National, and to and for the benefit of companies owned and controlled by Malofeyev, and caused a United States person to receive funds, goods, and services from Malofeyev, and from companies owned and controlled by Malofeyev, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by Malofeyev, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations § 589.201)

## COUNT TWO

### (Violation of the International Emergency Economic Powers Act)

The Grand Jury further charges:

38.     The allegations set forth above in Paragraphs 1 through 36 are realleged and incorporated by reference as if set fully forth herein.

39.     From at least in or about December 2014 up to and including at least in or about 2020, in the Southern District of New York and elsewhere, ALEXEY KOMOV, the defendant, unlawfully, willfully, and knowingly violated the IEEPA, and the regulations

13

promulgated thereunder, to wit, KOMOV willfully and knowingly caused United States persons

to provide funds, goods, and services to and for the benefit of Konstantin Malofeyev, whom OFAC

had listed as a Specially Designated National, and to and for the benefit of companies owned and

controlled by Malofeyev, and caused a United States person to receive funds, goods, and services

from Malofeyev, and from companies owned and controlled by Malofeyev, and did and attempted

to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States

held by Malofeyev, without first obtaining the required approval of OFAC, in violation of

Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and

attempted to engage in transactions that evaded and avoided and caused a violation of Executive

Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, and
Title 31, Code of Federal Regulations § 589.201; Title 18, United States Code, Section 2)

## **FORFEITURE ALLEGATION**

40.   As a result of committing the offenses alleged in Counts One and Two of this

Indictment, ALEXEY KOMOV, the defendant, shall forfeit to the United States, pursuant to Title

18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all

property, real and personal, which constitutes or is derived from proceeds traceable to the

commission of the offenses alleged in Count One and Count Two, including but not limited to a

sum of money in United States currency representing the amount of proceeds traceable to the

commission of said offenses.

### **Substitute Asset Provision**

41.   If any of the property described above as being subject to forfeiture, as a

result of any act or omission of ALEXEY KOMOV, the defendant,

a.    cannot be located upon the exercise of due diligence;

14

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

15